1    J. Noah Hagey, Esq. (SBN: 262331)
      hagey@braunhagey.com
2    Matthew Borden, Esq. (SBN: 214323)
      borden@braunhagey.com
3    Greg A. Call, Esq. (SBN: 227588)
      call@braunhagey.com
4    BRAUNHAGEY & BORDEN LLP
      220 Sansome Street, Second Floor
5    San Francisco, CA 94104
      Telephone: (415) 599-0210
6    Facsimile: (415) 276-1808

7    ATTORNEYS FOR PLAINTIFF
      GOTHAM CITY ONLINE, LLC
8

9

## UNITED STATES DISTRICT COURT

10

## NORTHERN DISTRICT OF CALIFORNIA

| 11 | GOTHAM CITY ONLINE, LLC, a Delaware limited liability company, | ) | Case No. |
|---|---|---|---|
| 12 | | ) | **COMPLAINT FOR MISAPPROPRIATION OF TRADE SECRETS; VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030) AND STORED COMMUNICATIONS ACT (18 U.S.C. § 2701); NEGLIGENT INTERFERENCE WITH EXISTING AND PROSPECTIVE ECONOMIC ADVANTAGE; CONVERSION; AND TRESPASS TO CHATTELS** |
| | Plaintiff, | ) | |
| 13 | | ) | |
| | v. | ) | |
| 14 | | ) | |
| | ART.COM, INC., a Delaware corporation, and Does 1–50, | ) | |
| 15 | | ) | |
| 16 | Defendant. | ) | |
| 17 | | ) | |

18                             **JURY TRIAL DEMANDED**

1      Plaintiff Gotham City Online, LLC ("Gotham City") alleges as against Defendant Art.com,

2 Inc. ("Defendant") as follows:

3                     **INTRODUCTION**

4      1.     This Complaint seeks damages, injunctive, and declaratory relief to remedy

5 Defendant's intentional conversion, theft and interference with Plaintiff Gotham City's computer

6 servers, computer code, consumer database, and other trade secrets and intellectual property.

7      2.     Plaintiff Gotham City is an internet-based fashion retailing business with tens of

8 millions of dollars in sales. In 2012, the principals of Gotham City sold a separate internet-based

9 poster business to Defendant which partly ran on Gotham City's web and database servers.

10 Defendant was obligated to remove the poster business from those servers, but never did so, and

11 breached other agreements with Gotham City, including by failing to pay for services and

12 withholding tax refunds due to the company.

13      3.     In January 2014, after Defendant further breached the parties' agreement and

14 withheld millions of dollars from Gotham City's principals, Gotham City terminated its

15 relationship with Defendant. As a courtesy, Gotham City allowed Defendant to continue to access

16 its files on Gotham City's servers so that Defendant could promptly migrate its material off of

17 them. Defendant, however, refused to remove its property. Instead, it illegally accessed the servers

18 and changed the security and ownership credentials on them to prevent Gotham City from

19 accessing or controlling its own property. Defendant then copied and altered Gotham City files,

20 including database files of Gotham City's consumers, and downloaded software and scripts to the

21 servers adding unspecified files to the servers without Gotham City's consent.

22      4.     Gotham City was able to restore its control over the servers after the server vendor,

23 Rackspace US, Inc. ("Rackspace"), intervened and recognized Gotham City's right to the material.

24 Defendant's web platform, however, continues to reside on the Gotham City servers, and

25 Defendant continues to run its business using Gotham City servers, without payment and without

26 Gotham City's permission or consent. Defendant also is continuing to possess Gotham City

27 computer code and related intellectual property which it illegally downloaded and stole during its

28 attempted conversion of the servers.

5.      As a result of Defendant's misconduct, Gotham City has suffered irreparable injury, including disruptions to its business, and lost sales and goodwill.  For a significant period of time, Gotham City's employees were unable to access their emails or to perform work for the company and its consumers.  Gotham City was forced to send home employees because they were unable to perform their jobs.  Moreover, because Defendant intentionally locked Gotham City's principals out of their own servers, Gotham City was unable to remedy these issues.

6.      Since then, Defendant continues to improperly squat on Gotham City's property, and refuses to return any of the stolen intellectual property.  Gotham City cannot properly operate, maintain, or upgrade its business without running the risk that it will be accused of interfering with Defendant's business.  And by continuing to use Gotham City's servers to engage in fraudulent and illegal business practices (including the sale of unlicensed or black market property), Defendant puts Gotham City at great risk to third-party claims.

7.      This suit seeks remedies under California trade secret law, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; the Stored Communications Act, 18 U.S.C. § 2701; and related tort law to require Defendant to immediately remove its property from Gotham City's servers, and to compensate Gotham City for the harm it has suffered as a result of Defendant's improper and illegal accessing and tampering with the servers.

## **PARTIES**

8.      Plaintiff Gotham City is a Delaware limited liability company with its principal place of business in Mayfield, Kentucky.  Gotham City is an online fashion retailer that sells goods in interstate commerce through its own websites, www.GothamCityOnline.com, www.shopgco.com, and www.shopnewyork.com.au, as well as on other popular websites such as Amazon and eBay.

9.      Defendant Art.com, Inc. is a Delaware corporation with its principal place of business in Emeryville, California.  Defendant Art.com, Inc. is an online retailer of art prints, posters, and other decorations.

10.     The true names of Defendants sued as Does 1 through 50 are unascertained to Plaintiff, who therefore sues these Defendants by such fictitious names.  Plaintiff will amend this

1   Complaint to allege their true names and capacities when ascertained. On information and belief,

2   these fictitiously named Defendants were involved in the design, implementation, approval, and

3   furtherance of the misconduct complained of herein or received benefits from such misconduct. On

4   information and belief, such Defendants aided and abetted, conspired with, and participated with

5   Defendants and others in the wrongful acts and course of conduct, or otherwise caused the damages

6   sought herein and are responsible for the acts, occurrences and events alleged in this Complaint.

7                          **JURISIDICTION AND VENUE**

8        11.    This Court has jurisdiction over the federal claims presented herein pursuant to the

9   Computer Fraud and Abuse Act, 18 U.S.C. §1030(g), and pursuant to the Stored Communications

10  Act, 18 U.S.C. § 2707. Jurisdiction over the other claims is based on 28 U.S.C. § 1338(b) and the

11  doctrine of supplemental jurisdiction.

12       12.    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because

13  the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and

14  is between citizens of different states.

15       13.    This Court has personal jurisdiction over Defendant because it is a resident of

16  California or regularly transacts business in this State and/or, as detailed below, has committed

17  tortious acts inside this State injuring Plaintiff within this State.

18       14.    Venue lies in the Northern District of California under 28 U.S.C. § 1391(a) because

19  a substantial part of the acts giving rise to the claims herein occurred in this district.

20                        **INTRADISTRICT ASSIGNMENT**

21       15.    Intradistrict Assignment is proper in the San Francisco or Oakland Division of this

22  Court pursuant to Local Rules 3-2(c) and (d) and 3-5(b).

23                          **FACTUAL BACKGROUND**

24       **A.    Gotham City's Servers**

25       16.    Prior to 2012, the principals of Gotham City owned Consolidated Consignment

26  Company ("CCC") which operated both a fashion business and poster business called Poster

27  Revolution. The websites and other operational software for the two businesses were stored on the

28

1   same two servers leased from third-party Rackspace, but were stored in separate locations on the

2   servers.

3        17.    In 2012, the principals of Gotham City sold CCC and Poster Revolution to

4   Defendant Art.com. As part of that sale, CCC divested all interest in the fashion business to

5   Gotham City. Thereafter, the principals of Gotham City became Defendant's employees, but

6   continued to run Gotham City. Critically, pursuant to the detailed sale agreement with Defendant,

7   Gotham City assumed ownership of the contract for the servers on which both companies'

8   information resided.

9        18.    The dedicated servers at issue are described in a contract between Gotham City and

10   Rackspace, Rackspace Contract No. 974800, and include, without limitation, the Dell R710 Web

11   Server (2 Processors, 24 GB RAM), the Dell R470 MSSQL Server (1 Processor, 12 GB RAM)

12   (collectively, the "Gotham Servers").

13        19.    At all times, Gotham City has paid Rackspace's hosting fees. Pursuant to the

14   parties' transition services agreement, Gotham City invoiced Defendant for its use of the Gotham

15   Servers.

16        20.    Gotham City uses its servers for almost every aspect of its business. The Gotham

17   Servers host, among other things, the customer-facing website, the programming code for various

18   proprietary pricing and order fulfillment programs, customer information including names,

19   addresses, email addresses, purchase history, and passwords to their Gotham City accounts, vendor

20   lists including names, addresses, purchase costs and purchase dates, internal fulfillment and

21   distribution functions for employees, time management software for payroll, employee names and

22   addresses, image serving software, and software that interfaces with websites such as Amazon.com

23   and eBay.com.

24        21.    Defendant, unlike Gotham City, maintains a vast web server infrastructure (outside

25   of the Gotham Servers) that supports its business, and could be used to host its property currently

26   stored on Gotham's Servers.

27

28

22.     In addition to the claims set forth herein, Defendant also owes Gotham City over $100,000 in connection with a tax refund it received on Gotham City's behalf, plus payments for continuing services and drop ship fulfillment services provided to Defendant by Gotham City.

**B.     Defendant's Unauthorized Access, Tampering, Alteration and Theft Regarding Gotham City's Electronic Information**

23.     On January 27, 2014, the same day that Gotham City's principals were scheduled to receive a multi-million dollar payment performance payment from their employer, two of them were taken into separate offices, told not to leave, and interrogated by in-house counsel and two separate sets of outside counsel regarding certain Defendant trade practices. During this process, they were handed a letter stating that their performance payment was "rescinded," and that they were suspended. The third Gotham City principal was on paternity leave, and was interrogated and then suspended over the telephone. The following day, all three were terminated.

24.     On January 29, 2014, Gotham City provided formal notice of termination of "any and all contracts, agreements, and arrangements between Gotham City and Defendant, effective today." As a courtesy to Defendant, however, Gotham City allowed Defendant to continue to have access to the Gotham Servers in order to promptly transition Defendant's business. Gotham City requested that Defendant immediately migrate off of Gotham's Servers all Defendant's property, and even offered to help with that migration. At no time, however, did Gotham City authorize Defendant to access, change, or tamper with Gotham City's separate property on its servers. Rather than make an effort to remove its property from the Gotham Servers, Defendant's personnel accessed, tampered with, and changed Gotham City property without authorization. They did so after secretly altering the security and administrative credentials for the Gotham Servers and having the ownership records at Rackspace converted to the name of Art.com. As a result, Gotham City was locked out of its own servers and rendered unable to manage its own business.

25.     While it had control of the servers, Defendant admitted to accessing and tampering with Gotham City's property on the Gotham Servers on February 6, 2014, in a telephone call between the parties to address the migration of Defendant's property off the Gotham Servers. On the call, an Art.com information technology employee admitted that Defendant had taken no steps

1    to migrate Defendant's information off the Gotham Servers. The employee further admitted that he

2    and members of his technology team had knowingly accessed the Gotham City portion of

3    Gotham's Servers (including both code and databases) and had intentionally altered Gotham City's

4    security credentials and passwords for accessing its servers, which prevented Gotham City from

5    accessing its own stored electronic information.

6         26.      In addition to illegally accessing Gotham City's information, Defendant

7    intentionally interfered with and disrupted Gotham City's business. For example, Defendant's

8    technology employee admitted that Defendant intentionally caused a service outage on the Gotham

9    City website on February 4, 2014, which caused Gotham City's website to be shut down for

10    approximately 30 minutes. Gotham City also had two other outages during this period, which, on

11    information and belief, were caused by Defendant.

12         27.      Defendant also admitted that it had accessed Gotham City's code and database,

13    which contains, among other things, Gotham City's customer information, vendor information, and

14    other proprietary information and trade secrets, and made changes to that code. Defendant further

15    admitted that it changed security credentials and passwords in Gotham City's database, which

16    blocked access to the system that Gotham City uses to manage its Kentucky operations. Defendant

17    also changed login credentials that blocked Gotham City employees from accessing their Gotham

18    City email accounts.

19         28.      Moreover, Defendant also appears to have copied and "moved" a large number of

20    critical Gotham City trade secrets and intellectual property from the servers to another undisclosed

21    location. Defendant created a folder on the servers entitled "moved", signaling a repository of files

22    that Defendant transferred to itself at another location. Many of the files within the "moved" folder

23    consist of Gotham City's own source code and other computer files that clearly do not belong to

24    Defendant.

25         29.      Upon learning that rather than migrating its property off the Gotham Servers,

26    Defendant was accessing and tampering with Gotham City's property, Gotham City requested that

27    Defendant immediately cease blocking Gotham City from accessing its own property, provide

28    Gotham City with a record of the files that Defendant accessed and/or altered, to restore Gotham

1   City's email accounts, and to take other steps to mitigate the harm Defendant caused.  Defendant,

2   however, did not respond.

3        30.     When Defendant refused to give Gotham City access to the Gotham Servers,

4   Gotham City contacted Rackspace directly to request that the Gotham Servers be returned to

5   Gotham City.   Rackspace performed a review, examined the relevant contracts, and determined

6   that Gotham City was the rightful owner of the servers.  On February 13, 2014, Rackspace returned

7   control and ownership of the servers to Gotham City.   Defendant, however, not only continues to

8   store its property on the Gotham Servers, but also maintains the ability to manage its own property

9   on the servers and to run its business.

10  **C.    Defendant's Continued Trespass on Gotham's Servers to Engage in Illegal and
        Deceptive Business Practices**

11

12       31.     Defendant's property, including all of the files, programs, and data it uses to runs its

    poster-selling business, remain stored and operating on the Gotham Servers.  Defendant's trespass

13  on the Gotham Servers irreparably harms Gotham City in at least the following ways:

14          **1.    Defendant's Illegal Business Practices are Facilitated by the Gotham
                Servers**

15

16       32.     After Gotham City's principals sold their Poster Revolution business to Defendant,

17  they discovered that Defendant engaged in a variety of unlawful and fraudulent business practices.

18  Throughout their employment, Gotham City's principals repeatedly complained about Defendant's

19  fraudulent and unlawful business conduct – all of which was known to Defendant's senior

20  management, including its General Counsel, Kevin Lucas.  Gotham City's principals raised some

21  of these issues in emails, and others orally, after they were repeatedly instructed not to commit their

22  complaints to writing.  On information and belief, Defendant continues to engage in each of these

23  unlawful business practices, detailed below, and is utilizing the Gotham Servers, without

24  authorization from Gotham City, to do so.

25          **a.    Sale of Grey and Black Market Goods**

26              **i.    Unlicensed Products**

27       33.     When Gotham City's principals were hired by Defendant, Defendant's SVP of

28  Merchandising, Gary Takemoto, explained that Defendant did business with bootleggers, *i.e.*,

companies that sell illegal, unlicensed images in violation of the copyright laws, such as Pop Culture Graphics and Movie Market.  He explained that Defendant knowingly conducted business with such companies, despite the risk of copyright law violations and other allegations of unfair business practices.  Gotham City's principals raised this issue with other members of management, who did nothing because such trade was lucrative for Defendant.

34.     For example, on information and belief, even today Defendant continues to sell thousands of posters without a license from the owner of image to do so, *e.g.*, properties belonging to:

a.     AMC Networks (*see* http://www.allposters.com/-sp/The-Walking-Dead-Posters_i8618491_.htm_ );

b.     Dreamworks (*see* http://www.allposters.com/-sp/How-to-Train-Your-Dragon-Posters_i8030984_.htm);

c.     HBO (*see* http://www.allposters.com/-sp/True-Blood-All-Flavor-No-Bite-Posters_i8549002_.htm);

d.     MGM Studios (*see* http://www.allposters.com/-sp/Hot-Tub-Time-Machine-Posters_i7937624_.htm);

e.     NBC Universal (*see* http://www.allposters.com/-sp/Curious-George-Posters_i7935074_.htm);

f.     American Broadcasting Company (*see* http://www.allposters.com/-sp/Modern-Family-TV-Posters_i8638181_.htm);

g.     Bruce Lee Enterprises (*see* http://www.allposters.com/-sp/Enter-the-Dragon-Posters_i7619293_.htm);

h.     Columbia Pictures (*see* http://www.allposters.com/-sp/Ghostbusters-2-Posters_i8035081_.htm);

i.     CBS Entertainment (aka Desilu, Too, LLC) (*see* http://www.allposters.com/-sp/How-I-Met-Your-Mother-Posters_i7413198_.htm);

j.     Fox Entertainment Group (*see* http://www.allposters.com/-sp/Napoleon-Dynamite-Posters_i8378637_.htm);

1            k.       Lionsgate Films (*see* http://www.allposters.com/-sp/Saw-3-D-

2 Posters_i7413268_.htm);

3            l.       Warner Bros. Entertainment Inc. (*see* http://www.allposters.com/-

4 sp/Teenage-Mutant-Ninja-Turtles-The-Movie-Posters_i8378749_.htm), and many more.

5      35.      On information and belief, Defendant is using the Gotham Servers to engage in sales

6 of such unlicensed products. In order to avoid scrutiny and potential documentary evidence of

7 Defendant's unlawful business practices, Defendant's senior management would declare certain

8 subjects "phone call topics." Defendant's business relationships with bootleggers was one such

9 "phone call topic."

10                **ii)     Intentional Sales of Prohibited Products in Prohibited Markets**

11

12      36.      Gotham City's principals also repeatedly complained that Defendant was knowingly

13 selling products overseas without a license to do so. The products sold by Defendant are licensed

14 for sale in specific geographic regions. For example, items licensed for sale in the U.S. may not be

15 sold in Europe. To engage in such sales, a company must buy its products from a different source

16 that has obtained a separate European license. The same holds true for sales in other countries.

17 Selling a product without a license "out of zone" violates the law and exposes a company to

18 liability from both vendors and from the intellectual property owners. Defendant knowingly

19 violated license agreements by selling products in Europe, and used a third-party shipping

20 consolidator to mask the final destination for such sales. Defendant does millions of dollars in such

21 illegal sales every year.

22      37.      While employed with Defendant, Gotham City's principals were repeatedly notified

23 by vendors that Defendant was selling products out of zone. They informed senior management of

24 these illegal practices on numerous occasions, but senior management failed to end the practices.

25 In fact, the issue became so contentious between Defendant and Gotham City's principals that

26 senior management insisted on a "phone call topic" conversation, in which it was explained that

27 Defendant would continue to sell unlicensed products in order to preserve its European revenue.

28

38.     Defendant also engages in fraudulent zoning classifications to facilitate the sale of unlicensed goods.  Any items sold on AllPosters.com are also sold on AllPosters.ca (Canada), AllPosters.br (Brazil), and AllPosters.com.au (Australia) even though Defendant knows such sales violate regional licenses.  Gotham City's principals raised these concerns with Defendant's CEO, who said he would "look into it," rather than taking the appropriate course of action, *e.g.*, turning off the revenue pending an investigation.  Nothing was ever done, and such classifications continue today.

39.     For example, on information and belief, Defendant is violating licenses by selling outside of the licensed zone products belonging to, *e.g.*:

    a.     Trevco Sportswear (http://www.allposters.com.br/gallery.asp?apnum=8762583);

    b.     FEA (http://www.allposters.com.br/gallery.asp?apnum=9845936);

    c.     Aquarius, Ltd (http://www.allposters.com.br/?apnum=8736259);

    d.     Hi Fidelity Entertainment (http://www.allposters.com.br/gallery.asp?apnum=9451432);

    e.     Advance Graphics (http://www.allposters.com.br/-sp/Harry-One-Direction-posters_i9053323_.htm);

    f.     Bravado (http://www.allposters.com/-sp/Eminem-Hood-Posters_i8075434_.htm);

    g.     Trends International (http://www.allposters.com.br/gallery.asp?apnum=9504387);

    h.     American Classics, Inc. (http://www.allposters.co.uk/-sp/Jaws-Stressed-Out-Posters_i9093475_.htm), and many more.

40.     On information and belief, Defendant is using the Gotham Servers to continue to engage in intentional sales of prohibited products in prohibited markets.

**b.     False Advertising**

41.     Defendant engages in several forms of false and deceptive promotions that constitute false advertising in violation of the FTC Act and state consumer protection statutes.

42. One form of false advertising by Defendant is its fraudulent "last chance" and "sale extended" sale promotions designed to deceive consumers and entice them to purchase Defendant's products on a false deadline at a supposed (and often illusory) discount. Defendant emails consumers that they have a firm deadline to take advantage of a "sale" price, even though Defendant and its senior executives have no intention to adhere to that deadline. The sale "deadline" is then "extended" according to a pre-planned schedule. This allows Defendant to send another email to consumers about the sale and to create two "last days" to drive sales.

43. Defendant maintains an Excel-format planning document that scripts the timing of the surprise "sale extension" right before the sale deadline is set to expire. The Excel file is maintained on the company's intranet and tracks upcoming promotions for over 17 of Defendant's web properties in the U.S. and internationally.

44. For all of the territories, Defendant plans the same sequence of initially deceptive (and outright false) sale advertisement, followed by a pre-planned "sale extended" email. All the fraudulent emails are reviewed and approved of by Defendant's CEO Geoffroy Martin. Defendant's SVP of Merchandising, Gary Takemoto, leads this fraudulent advertising campaign and maintains the associated Excel tracking chart.

45. Defendant's deceptive sales tactics violate numerous State and federal laws, including without limitation the Consumer Legal Remedies Act ("CLRA"), which forbids "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions," Civ. Code § 1770(a)(13), the Unfair Competition Law, Business & Professions Code §§ 17200 *et seq*. ("UCL"), and the False Advertising Law, Business & Professions Code §§ 17500 *et seq*. ("FAL"), which states: "No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement." Bus. & Prof. Code § 17501; *see also Hinojos v. Kohl's Corp.*, 718 F.3d 1098 (9th Cir. 2013) ("Retailers, well aware of consumers' susceptibility to a bargain, therefore have an incentive to lie to their customers by falsely claiming that their products

1  have previously sold at a far higher 'original' price in order to induce customers to purchase

2  merchandise at a purportedly marked-down 'sale' price. Because such practices are misleading –

3  and effective – the California legislature has prohibited them."); 16 C.F.R. § 233.1 ("where an

4  artificial, inflated price was established for the purpose of enabling the subsequent offer of a large

5  reduction – the "bargain" being advertised is a false one").

6        46.    Defendant also intentionally hides promotions from customers who have purchased

7  gift cards or daily deal discounts in order to prevent these customers from maximizing the return on

8  their investments. Such conduct is obviously fraud and violates numerous provisions of the CLRA,

9  *e.g.*, Civ. Code § 1770(a)(9), (10), (13), (14), (16), (20), as well as the FAL.

10        47.    For example, Defendant runs promotions on third-party sites such as Groupon,

11  where a customer can purchase a $50 discount card for $25. But when the purchasing consumers

12  click through the promotional website links in order to redeem their purchases, Defendant's site

13  technology hides current site-wide promotions and sales, which are often a better savings for the

14  consumer than the promotion they just purchased. CFO Kurth in the finance department was a

15  staunch proponent of these deceptive practices in order to minimize the impact of the Defendant's

16  discounting programs and to drive up revenue.

17        48.    On information and belief, Defendant is using the Gotham Servers to continue to

18  engage in these false advertising practices.

19        **c.    Predatory Pricing**

20        49.    Defendant also has engaged in below cost pricing in Europe. Upon taking over

21  European trend sales from Plaintiffs, Defendant started a "price war" with competitor Buy 4 Less

22  in Europe, where it sold products close to, if not below, cost. As its European sales volume

23  increased, Defendant began fulfilling orders from its warehouse in the Netherlands, instead of from

24  the United States. When Defendant began shipping products from Europe, it became obligated to

25  pay a 20% VAT tax, which required Defendant to either raise its prices or sell its products at a loss.

26  Defendant opted for the latter option, at the express instruction of CEO Martin.

27        50.    Senior management including CEO Geoffroy Martin specifically discussed the fact

28  that Defendant's sales on Amazon in the UK were below Defendant's costs. At Martin's

instruction, Defendant determined to continue such practices. In fact, such pricing still exists. As recently as February 3, 2014, internet searches on Amazon.com show Defendant dumping products in Europe at less than its marginal cost.

51.     On information and belief, Defendant is using the Gotham Servers to continue to engage in predatory pricing.

### d.     Entering Into Vendor Payment Agreements with No Intent to Comply

52.     Gotham City's principals also complained about Defendant intentionally entering into vendor agreements without any intention of complying with the payment timing provisions. In Spring of 2013, Defendant implemented a policy to slow pay all vendors to see just how late Defendant could pay vendors. Senior management said the slow pay business practice was an effort to manage working capital, *i.e.*, cash flow. This resulted in an increased amount of vendor complaints, and loss of goodwill and business. One of Gotham City's principals, Adam Hersh, voiced these concerns on numerous occasions, and even requested at one point that all vendors be put on the "pay on time" list, to which he received a flat "no." When Gotham City's principals alerted their superiors, Chris Burns and Chuck Kurth, they conceded that Defendant had a policy of late-paying vendors, and said Defendant would do nothing.

53.     On information and belief, Defendant is using the Gotham Servers to continue to engage in the practice of intentionally paying vendors late.

### 2.     Defendant's Ongoing Access to Gotham's Servers

54.     Defendant not only continues to store its property on Gotham's Servers, but it continues to access the Gotham Servers, via an administrative portal, to run its business.

55.     Defendant's ongoing access to Gotham's Servers put Gotham City's business at risk, as Defendant could take actions on the servers that could slow or even cause outages to Gotham City's business running on the same servers. To date, Gotham City has not locked Defendant out of the Gotham Servers due to Defendant's threats that it will seek to hold Gotham City liable for all business losses that may result from losing access.

### 3.   Gotham City Cannot Use Its Own Storage Space and Bandwidth

56.   Defendant's continuing use of the servers further harms Gotham City in that Gotham City cannot utilize the storage space or bandwidth it is paying for and it is entitled to. Gotham City is a relatively small, but rapidly growing company, and needs the server space currently being used by Defendant to upgrade, improve, and develop its business.

### 4.   Gotham City Cannot Perform Server Maintenance

57.   Defendant's continuing use of the servers also harms Plaintiff in that it prevents Plaintiff from performing necessary server maintenance.  Any substantial maintenance may have the result of affecting Defendant's properties and functions stored on the Gotham Servers, and Plaintiff has threatened to hold Plaintiff liable for all business losses that may result from changes or alterations to Gotham's own servers.

### CLAIMS FOR RELIEF

**First Claim for Relief**
**(Actual and Threatened Misappropriation of Trade Secrets)**

58.   Gotham City repeats and realleges the allegations in each of the Paragraphs above as if fully set forth herein.

59.   The Gotham Servers contain, *inter alia*, the programming code for various proprietary pricing and order fulfillment programs, customer and vendor lists and information, internal fulfillment and distribution functions for employees.  These materials constitute trade secrets under the California Uniform Trade Secrets Act.  Such information is not generally known to the public and has independent economic value.  Competitors would obtain an advantage from the disclosure and/or use of such materials.  Gotham City considers such information to be trade secrets and has made reasonable efforts to preserve the confidentiality and secrecy of such information, including by protecting it security passwords that prevent access to such data.

60.   Defendant has accessed Gotham City's trade secrets and, upon information and believe, has taken those trade secrets by copying it and transferring it without Gotham City's consent.  Further, as a result of its access, Defendant had access to Gotham City's programming code for various proprietary pricing and order fulfillment programs, customer and vendor lists and information, internal fulfillment and distribution functions for employees.

61.    As a result of Defendant's misconduct, Gotham City is informed and believes and therefore alleges that Defendant has actually misappropriated Gotham City's trade secrets in violation of the California Uniform Trade Secrets Act.

62.    Defendant has and will continue to wrongfully use and threaten misuse of Gotham City's trade secrets unless the relief requested herein is granted.

63.    As a proximate result of Defendant's misappropriation and threatened misappropriation, Gotham City has suffered and will continue to suffer irreparable harm, as well as damages in an amount to be proven at trial, but which are substantial and in excess of the minimum jurisdictional amount of this Court.

**Second Claim for Relief**
**(Violation of the Computer Fraud and Abuse Act)**

64.    Gotham City repeats and realleges the allegations in each of the Paragraphs above as if fully set forth herein.

65.    The Gotham Servers are involved in interstate and foreign commerce and communication.

66.    Defendant intentionally accessed without authorization Gotham City's electronic information stored on its servers.

67.    Defendant has intentionally accessed and knowingly caused the transmission of information to Gotham City's servers without authorization, intentionally or recklessly causing damage and loss to Gotham City's property and business.

68.    Defendant's actions violate the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, including subsections (a)(2)(C), (a)(4), (a)(5)(A), (a)(5)(B), and (a)(5)(C) and (g), and have caused Gotham City in excess of $5,000 in damages directly to its servers and information stored thereon, and have caused and continue to cause Gotham City to suffer irreparable injury to its business as result of loss of trade secrets and other intellectual property, loss of goodwill due to site outages, and an inability to fully control and remedy Defendant's alterations to Gotham's Servers.  There is no adequate remedy at law to redress such harms.

**Third Claim for Relief**
**(Violation of the Stored Communications Act)**

69.     Gotham City repeats and realleges the allegations in each of the Paragraphs above as if fully set forth herein.

70.     The Gotham Servers facilitate electronic communication services, such as emails.

71.     Defendant intentionally accessed, without authorization, Gotham City's servers, and altered security information and passwords, thereby preventing Gotham City and certain of its employees from accessing emails stored on the servers and from sending or receiving emails.

72.     Defendant's actions violate the Stored Communication Act, 18 U.S.C. § 2701, including subsections (a)(1) and (a)(2), and 18 U.S.C. § 2701, and have caused Gotham City to suffer irreparable injury to its business as result of loss of business communications and loss of goodwill due to inability to access emails.

**Fourth Claim for Relief**
**(Interference with Existing and Prospective Economic Advantage)**

73.     Gotham City repeats and realleges the allegations of the Paragraphs above as if fully set forth herein.

74.     Defendant, as a user with access to and sharing the Gotham Servers, owed Gotham City a duty of care.

75.     As a former employer of Gotham City's principals, and operator of a similar online retail business, and who maintains similar contacts and information on Gotham's Servers, had and has extensive knowledge of Gotham City's operations and existing and prospective relationships.

76.     Because of Defendant's relationship with Gotham City, Defendant knew or had reason to believe that the aforementioned wrongful conduct engage in by Defendant, including but not limited to Defendant's unauthorized access of and alteration of Gotham's Servers, would affect and irreparably harm Gotham City's economic relationships with Gotham City's customers, vendors, and distributors and that such relationships contained a probability of future economic benefit.

77.     Defendant intentionally altered Gotham City's electronic files and servers. Defendant failed to act with reasonable care when it accessed and altered the Gotham Servers and

1  therefore wrongfully interfering with Gotham City's existing and prospective economic

2  relationships with its customers, vendors, and distributors.

3    78.    As a direct and proximate result of Defendant's wrongful acts, Gotham City has

4  suffered and continues to suffer damage to its business by way of lost sales and loss of goodwill.

5                                    **Fifth Claim for Relief**
                                         **(Conversion)**
6

7    79.    Gotham City repeats and realleges the allegations of the Paragraphs above as if fully

   set forth herein.
8

9    80.    At all times herein mentioned, Gotham City was the owner of its trade secrets,

   confidential and proprietary information, and the Gotham Servers, and therefore was entitled to
10

   sole possession and control of that property.
11

12   81.    Gotham City gave Defendant permission to access the poster side of Gotham's

   Servers so as to effectuate migration of the poster business and technology to Defendant's systems.
13

   At no time was Defendant authorized or given permission to access the Gotham Servers or
14

   proprietary information.
15

16   82.    Defendant accessed Gotham City's servers and data files and converted them,

   depriving Gotham City of the use of such materials.
17

18   83.    Upon information and belief, Defendant has removed and retained Gotham City's

   trade secrets, and other proprietary and confidential information from Gotham City's servers,
19

   without permission or authorization, and upon information and belief, to use said property for the
20

   benefit of a competitor and/or itself.
21

22   84.    Between the time of Defendant's conversion of Gotham City's property and the

   filing of this action, Gotham City has expended time and money in the pursuit of the converted
23

   property, and efforts to obtain information related to Defendant's improper and unlawful access
24

   and conversion of Gotham City's property.
25

26   85.    As a proximate result of Defendant's misconduct Gotham City has suffered

   damages in an amount to be proven at trial.
27

28

86.     Defendant's acts alleged above were willful, wanton, malicious, and oppressive, and warrant the award of exemplary and punitive damages.

### Sixth Claim for Relief
### (Trespass to Chattels)

87.     Gotham City repeats and realleges the allegations of the Paragraphs above as if fully set forth herein.

88.     At all times herein mentioned, Gotham City was and still is the owner of the Gotham Servers, and the trade secrets, confidential and proprietary information, and other information stored thereon, and is entitled to exclusive possession and control of that property.

89.     Defendant has intentionally interfered with Gotham City's use and possession of the Gotham servers by storing its property on the Gotham Servers and refusing to remove it after having been repeatedly asked to do so by Gotham City.

90.     Defendant's trespass prevents Gotham City from maintaining, servicing, upgrading, and operating it business, and uses valuable storage space and bandwidth.

91.     Defendant's trespass also creates potential legal liability for Gotham City as Defendant is using the Gotham Servers to engage in illegal and fraudulent business practices.

92.     As a proximate result of Defendants conduct, Gotham City has suffered and is suffering irreparable harm, as well as damages in an amount to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, Gotham City prays for judgment as follows:

A.     Injunctive relief, including relief *pendente lite*.

B.     Declaratory relief.

C.     Damages according to proof at trial.

D.     Attorney's fees and costs.

E.     All such other and further relief in law and equity as the Court may deem appropriate.

Dated:  March 4, 2014

Respectfully Submitted,

BRAUNHAGEY & BORDEN LLP


By:  ___/s/_____
          J. Noah Hagey

Attorneys for Plaintiff Gotham City Online, LLC

COMPLAINT

1                                        **DEMAND FOR JURY TRIAL**

2               Pursuant to Civil Local Rule 3-6 and Federal Rules of Civil Procedure 38(b), Plaintiff

3 hereby demands a jury trial of all claims and causes of action triable before a jury.

4

5 Dated:  March 4, 2014                         Respectfully Submitted,

6                                          BRAUNHAGEY & BORDEN LLP

7

8                                       By:    /s/_____
                                                J. Noah Hagey

9                                       Attorneys for Plaintiff Gotham City Online, LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT